L8DsSAN1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

           v.                          19 Cr. 734 (VSB)

JAIME SANTANA,

             Defendant.                    Sentence

------------------------------x

                            New York, N.Y.
                            August 13, 2021
                            10:00 a.m.

Before:

              HON. VERNON S. BRODERICK,

                            District Judge

                    APPEARANCES

AUDREY STRAUSS
     United States Attorney for the
     Southern District of New York
BY: JUSTIN RODRIGUEZ
     Assistant United States Attorney

ALLAN P. HABER
     Attorney for Defendant

L8DsSAN1

1          (Case called)

2          THE COURT:  If I could ask counsel to please identify

3    themselves for the record.

4          MR. RODRIGUEZ:  Good morning, your Honor.  Justin

5    Rodriguez for the United States.

6          THE COURT:  Good morning.

7          MR. HABER:  Good morning, your Honor.  Allan Haber for

8    Jaime Santana.

9          THE COURT:  Good morning, Mr. Haber.

10          Good morning, Mr. Santana.

11          So this matter is on for sentencing in United

12    States v. Jaime Santana.

13          Now, Mr. Santana, if at any point in time during the

14    proceedings you don't understand something that I say or if you

15    would like to speak with Mr. Haber, just let me know, and I'll

16    stop the proceedings and either I or Mr. Haber will try to

17    answer your questions, or I'll let you speak to Mr. Haber in

18    private.  OK?

19          THE DEFENDANT:  All right.  Thank you, sir.

20          THE COURT:  Mr. Haber, remain seated.  Mr. Rodriguez

21    also.  Move the microphone closer to you.

22          MR. RODRIGUEZ:  I just wanted to inquire, I know the

23    court posted on the docket there would be a call-in number for

24    members of the public.  I just wanted to confirm that that was

25    active.

L8DsSAN1

1         THE COURT:  I'll have to check to see if my law clerk

2    dialed in.

3         MR. RODRIGUEZ:  OK.

4         THE COURT:  If you want, we'll wait a second.  She'll

5    be right back up.

6         MR. RODRIGUEZ:  I appreciate that, your Honor.  I know

7    that from the government's side, there were a few people

8    interested in dialing in.

9         THE COURT:  Sure thing.

10        (Pause)

11        If we could go on the record.

12        I would just ask counsel to introduce themselves

13   again, now that the members of the public are on.

14        MR. RODRIGUEZ:  Good morning, your Honor.  Justin

15   Rodriguez for the United States.

16        THE COURT:  Good morning.

17        MR. HABER:  Good morning, your Honor.  Allan Haber for

18   Jaime Santana.

19        THE COURT:  OK.  Good morning.

20        Good morning, Mr. Santana, as I mentioned before.

21        THE DEFENDANT:  Good morning.

22        THE COURT:  As I mentioned before, no need to stand up

23   at this juncture.  The only thing I ask is if you could pull

24   the microphone a little bit closer to you.

25        That's great.  Thank you.

L8DsSAN1

1      Now, as I mentioned before, if at any point in time
2  you have a question or if you would like to speak to Mr. Haber,
3  just let me know, and either I or Mr. Haber will try and answer
4  your question or I'll allow you to speak to Mr. Haber in
5  private.  OK?
6      THE DEFENDANT:  All right, thank you, sir.
7      THE COURT:  Now, as an initial matter, I would like
8  to review the materials that I have received and read in
9  connection with today's sentencing.  I've received the
10  presentence report, which was initially prepared on October 28
11  of 2020 and revised on November 24 of 2020.  I've also received
12  defendant's August 4 sentencing letter, sentencing letter with
13  various attachments.  Those attachments include a mitigation
14  report and letters from Mr. Santana's oldest daughter, his
15  youngest daughter, his ex-wife, and his sister.  I've also
16  received the government's sentencing submission file on the
17  August 8 of 2021.  I'm sorry.  If I didn't mention this,
18  defendant's was filed August 4, 2021.  I want to make sure I
19  said 2021.
20    OK.  Let me ask, have the parties received each of these
21  submissions, Mr. Rodriguez?
22      MR. RODRIGUEZ:  Yes, your Honor.
23      THE COURT:  Mr. Haber?
24      MR. HABER:  Yes, your Honor.
25      THE COURT:  All right.  Have all the submissions been

L8DsSAN1

1   filed on the docket?

2           MR. RODRIGUEZ:  Yes, your Honor.

3           MR. HABER:  Yes, your Honor.

4           THE COURT:  OK.  Fantastic.

5           Now, are there any other submissions that I haven't

6   mentioned that I should have in connection with today's

7   sentencing?

8           MR. HABER:  No, your Honor.

9           MR. RODRIGUEZ:  No, your Honor.

10          THE COURT:  All right.  Thank you.

11          Mr. Haber, have you received the resentence report and

12  discussed it with Mr. Santana?

13          MR. HABER:  I have, your Honor, and my client, by the

14  way, is Spanish, but he speaks fluent English.  We don't have

15  the aid of an interpreter.

16          Also, the court should be aware that his mother is in

17  court.  He had several other family members that wanted to

18  come, but apparently his sister's son was killed in an auto

19  accident, and she is grieving now and couldn't make it up here

20  from Tennessee.

21          THE COURT:  OK.

22          MR. HABER:  My apologies for that, your Honor.

23          THE COURT:  No.  No, that's fine.  I know there were

24  several members who were going to attend.

25          My condolences.  I'm sorry to hear that.

L8DsSAN1

| 1 | THE DEFENDANT:  Thank you. |

1          THE DEFENDANT:  Thank you.

2          THE COURT:  Let me ask, Mr. Santana, have you read the

3  presentence report?

4          THE DEFENDANT:  Yes, sir.

5          THE COURT:  Have you discussed it with Mr. Haber?

6          THE DEFENDANT:  Yes, sir.

7          THE COURT:  Have you had an opportunity to discuss

8  with Mr. Haber any errors or anything else that you think

9  should be in the report?

10          Have you been able to discuss that with him?

11          THE DEFENDANT:  Yes, sir.

12          THE COURT:  All right.  Mr. Haber, do you have any

13  objections to the report?

14          MR. HABER:  The only objection I have is for the

15  recommended sentence, which I think is a little off the wall,

16  little off the roof, and I made that clear, I think, in my

17  letter.

18          THE COURT:  You did.

19          MR. HABER:  But I think from a legal perspective, the

20  letter is accurate.

21          THE COURT:  OK.  All right.  Thank you.

22          Let me ask, AUSA Rodriguez, do you have any objections

23  to the report?

24          MR. RODRIGUEZ:  No, your Honor.

25          THE COURT:  All right.  I'm going to adopt the factual

L8DsSAN1

findings in the presentence report, and the presentence report
will be made part of the record in this case.  It will be
placed under seal.  If there is an appeal taken, counsel on the
appeal can have access to the report without further
application to myself or one of my colleagues.

Now, Mr. Santana, in considering what the appropriate
sentence is for you, I must consider the sentencing guidelines.
Now, the guidelines are a set of rules that were designed to
assist judges like myself when we impose sentence on
individuals convicted of crimes.

Now, although these guidelines have been mandatory at
a certain point in time, and that would have meant that I would
have been required to follow them in almost every instance,
they are no longer binding.  However, I am still required to
consider the applicable guideline range as one factor among
others when determining an appropriate sentence.  In a sense,
the guidelines are a starting point.  So my first task is to
determine what the sentencing range is under the guidelines.

Now, I'm going to use the November 1, 2018 guidelines
in this case to determine the applicable guideline range.
First, Count One involves a violation of Title 18, United
States Code, Section 1962, the RICO statute, which is covered
by Section 2E1.1 of the guidelines.  Now, pursuant to that
section, the base offense level is the greater of 19 or the
offense level applicable to the underlying racketeering

L8DsSAN1

activity.  Because there are more than one underlying offenses

here, one is a narcotics conspiracy, which is racketeering act

one, and the other is conspiracy to commit extortion, which is

racketeering act two, each underlying offense be treated as if

it contained a separate count of conviction for the purposes of

the guidelines.  Because there are multiple underlying offenses

and multiple-count analysis must be performed.

          Here, that means Count One, and racketeering act one,

and Count Two, the narcotics conspiracy, are grouped together

and form group one.  Because the offense level is determined

largely based on the quantity of the substance involved, now,

racketeering act two forms its own group, and that is group

two.

          Now, with regard to group one, the guideline for

violation of the RICO statute is 2B1.1.  Now, pursuant to that

section, the base offense level, as I mentioned, is the greater

of 19 or the offense level applicable to the underlying

racketeering activity.  Now, here, that activity is drug

distribution.  And the section that is applicable of the

guidelines to that is 2D1.1.  So pursuant to that section of

the guideline, because the offense involved at least 500 grams

but less than 1.5 kilograms of methamphetamine, the base

offense level is 30.  Two levels are then added to that because

Mr. Santana possessed a firearm during the incident offense.

Therefore, the base offense level is 32.  So that's group one.

L8DsSAN1

1          Now, group two, as with group one, the guideline for
2     violation of the RICO statute, the base offense level is the
3     greater of the base offense level 19 or the applicable
4     underlying racketeering activity.  Now, the underlying activity
5     involved extortion, and the base offense level is 18.  Two
6     levels are added because the offense involved an expressed or
7     implied threat of death, bodily injury, or kidnapping, in that
8     Santana conspired to extort another gang member who needed to
9     repay money or would result in a green light, because that gang
10    member had introduced a bad connection.  In other words, a bad
11    drug supplier, and that drug supplier provided poor quality
12    methamphetamine.  So, therefore, the base offense level becomes
13    20.
14          Now, the multiple-count adjustment must be performed
15    and that required one unit be assigned to the group with the
16    highest offense level.  One additional unit is assigned for
17    each group that is equally serious or from one to four levels
18    less serious.  One half of a unit would be assigned to any
19    group that is five to eight levels less serious than the
20    highest level.
21          Now, any groups that are nine or more levels less
22    serious are disregarded.  So here, applying those criteria, the
23    results are one unit for group one, no units for group two,
24    therefore, there is no adjustment that is made to the offense
25    level and the offense level remains 32.

L8DsSAN1

1          Now, because Mr. Santana was an organizer or leader

2    within the enterprise, here, the MS-13 gang, and of the

3    criminal activity that involved -- the criminal activity

4    involved five or more participants or was otherwise extensive,

5    an additional four levels are added.  So the combined adjusted

6    offense level is 36.  Now, three levels are subtracted from

7    that for Mr. Santana's acceptance of responsibility for a level

8    of 33.

9          Mr. Santana has ten criminal history points resulting

10   in a criminal history category of V.  Now, at a total offense

11   level of 33, criminal history category V, the guideline range

12   that is applicable here is 210 months to 262 months'

13   imprisonment.  Now, I do recognize that the plea agreement

14   contained a different range because the parties had only been

15   aware of one criminal history point resulting in a criminal

16   history category of I.  Now, the guideline fine range is 35,000

17   to $5 million, and the guideline supervised release range is

18   one to three years on Count One and four to five years on Count

19   Two.

20         Let me ask, do the parties agree based upon my

21   calculations that Mr. Santana's guideline range is 210 months

22   to 262 months?

23         MR. RODRIGUEZ:  Yes, your Honor.

24         MR. HABER:  Yes, your Honor.

25         THE COURT:  OK.  I believe, am I correct that the plea

L8DsSAN1

1    agreement had a guideline range of, is it, 100 -- I'm sorry --

2             MR. RODRIGUEZ:  Your Honor, if I may?

3             THE COURT:  Yes.

4             MR. RODRIGUEZ:  It was 135 to 168 months of

5    imprisonment.

6             THE COURT:  OK.  All right.  Now, the probation

7    department has recommended a sentence of 168 months.

8             Mr. Haber, in your sentencing submission on behalf of

9    Mr. Santana, you requested a variance, and your request is for

10   a sentence of 60 months.  The government has requested a

11   sentence within the guideline range.

12            Now, with regard to the applicability of any

13   departures, I do recognize I have the authority to depart.

14   However, I do not find that there is a basis for a departure.

15   However, I do recognize that I do have the ability to grant a

16   variance.

17            Let me ask, AUSA Rodriguez, do you wish to be heard

18   with regard to sentencing?

19            MR. RODRIGUEZ:  Yes.  Thank you, your Honor.

20            THE COURT:  Sure.  Go ahead.

21            MR. RODRIGUEZ:  Your Honor, this is our first

22   appearance before the court.  This case was originally assigned

23   to Judge Pauley, but with his very tragic passing, it was

24   reassigned to your Honor.

25            If you'll permit me some brief background on the case.

L8DsSAN1

1          THE COURT:  Sure.

2          MR. RODRIGUEZ:  At the center of this case is MS-13,

3     which is one of the most notorious criminal enterprises in the

4     world.  The defendant, Mr. Santana, is a very high-ranking

5     member of that enterprise.  Now, there are two aspects of MS-13

6     that I think are particularly relevant for today's purposes.

7     One is the gang's history for committing acts of violence.

8     That is certainly something that the defendant was aware of and

9     embraced.  In fact, there is a particular provision of the plea

10    agreement -- and this is on page three -- where Mr. Santana

11    admits that he participated in MS-13 knowing that members and

12    associates of the gang committed, conspired, attempted, and

13    threatened to commit acts of violence against rival gang

14    members and others in furtherance of the enterprise.

15         The second aspect of the enterprise that I think is

16    relevant for the court's consideration is the loyalty and

17    longevity of some of its most senior members.  That is

18    illustrated by Mr. Santana.  Mr. Santana joined the gang, as

19    reflected in the PSR, at the age of 13.  Now, it is worth

20    pausing for a second, because Mr. Santana is not being

21    sentenced here today for crimes he committed at the age of 13

22    or in his teenage years or even in his 20s.  Oftentimes, the

23    argument is made to the court that people who commit crimes at

24    that age do so as a result of youthful indiscretion and that

25    they are likely to age out of committing crimes in the future.

L8DsSAN1

1          That didn't happen here.  Mr. Santana committed the

2    crimes that he is being sentenced for here today in his late

3    30s.  He did not age out of crime.  He had literally decades,

4    after he joined the gang, to mature, to reflect on his choices,

5    and he did not choose a different way.  In a way, that is not

6    really surprising because of the success and the high position

7    he achieved in the gang.

8          The basic structure of MS-13, its fundamental unit is

9    the clique.  Cliques can be roughly analogized to local

10   chapters, but they are sometimes member of the same clique who

11   can be operating in different states.  Multiple cliques within

12   MS-13 are then aligned into larger units called programs.  The

13   particular program at issue in this case is a program called

14   the LA program of MS-13.  The larger program, which is not only

15   nationwide, but really spans both Central America and North

16   America, is governed by something called a table, which is sort

17   of akin to a leadership council.  Five of the six members --

18   excuse me -- five of the six defendants on this indictment are

19   members of that table, that governing council of the LA program

20   and they span, like as I suggested, the entire United States.

21         Mr. Romero at the time was based in California.  In

22   fact, he was in California State Prison participating in the

23   affairs of the gang through a contraband prison cell phone.

24   Mr. Santana was based in Tennessee.  Mr. Garcia was based here

25   in New York.  Mr. Guerrero-Melgares was based in Virginia.  I'm

L8DsSAN1

1   sorry.  That is four of the members of the defendants on the

2   indictment.

3           This leadership council did the sort of things that

4   managers do.  They coordinated efforts across states, and they

5   solved problems and issues that came up in the gang.  One of

6   them is the extortion conspiracy that's at issue here, which

7   I'll get to in a second.

8           But Mr. Santana, at least for the purpose of time that

9   is covered by the indictment, which is to say 2019, was so

10  senior that he was considered -- and the government would be

11  able to prove this through cooperator testimony -- that he was

12  widely considered to be the highest ranking non-incarcerated

13  member of the LA program of MS-13, with Mr. Romero being the

14  highest rank, though at the time he was incarcerated.

15          So what are the particular criminal acts that bring us

16  here today?  This is really three crimes wrapped into one, and

17  with that MS-13 wrapping, they are all made worse.  Here is

18  what I mean by that.  First, Mr. Santana was involved in

19  selling illicitly firearms and ammunition, as well as

20  narcotics.

21          But to focus on the firearms and ammunition for a

22  second.  He sold a 9mm handgun, .40 caliber handgun, and a

23  .45 caliber hand gun, as well as boxes of ammunition to people

24  who were thankfully working at the direction of law enforcement

25  and able to remove these firearms from the stream of criminal

1    commerce.  Here is why that is important, your Honor.  We have,

2    as the court undoubtedly knows, a gun violence problem in this

3    country and in this city.  Oftentimes, I'm here or one of my

4    colleagues is here after somebody has been shot, after somebody

5    has been killed.

6                (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    L8dWsan2

2            MR. RODRIGUEZ:  But it's this kind of activity that is

3    really the root cause.  The flow of illegal firearms from other

4    areas of the country, like in Tennessee, where Mr. Santana sold

5    the guns, has an impact and a result here in New York City and

6    in this district, where it results in people being harmed and

7    killed.  And so Mr. Santana, through his activity, is really

8    exemplary of the kind of poor conduct that results in that.  So

9    that's one component of this.

10           The second crime that's wrapped into this is

11   Mr. Santana's involvement in helping to set up what I would

12   describe as a pipeline or distribution network of

13   methamphetamine throughout the country.  Now, the main

14   architect of this is the top person on the indictment,

15   Mr. Romero, but to make this work, he needed people and he

16   needed leaders on the outside to execute this plan, and

17   Mr. Santana was one of those people.  He was intercepted on

18   phone calls, which are described in the PSR, in which he,

19   Mr. Romero and others were planning the distribution network of

20   methamphetamine from Mexico to various places throughout the

21   United States, including North Carolina, New York, Virginia,

22   and Tennessee.

23           Now, methamphetamine is, of course, itself a very

24   dangerous drug, one that leads to crippling addictions, even

25   death, but I think it is made all the worse in the context of

this gang, because it is the lifeblood of the gang.  It is what provides currency and bankrolls the gang's activities.  So when members of MS-13 commit acts of violence, when junior members of the gang are directed to commit an act of violence, we know that it's not a BYOG, bring your own gun.  They're supplied by members, senior members, of the organization who are responsible for maintaining a collection of firearms to use for common gang purposes.

Where do they get the money to buy these firearms?

Narcotics trafficking is one of their most lucrative sources.  So this is narcotics trafficking with multiple harms, the harms that we see in regular narcotics trafficking, because of the dangerousness of the drug and its effects on people lives, but it's also the harm of what happens to the proceeds when put in the hands of the people in this organization.

The third crime that's wrapped up into this is extortion, and this is explained in the PSR.

Mr. Santana being a high-ranking member of the organization, when there was a problem and a serious problem that arose, he and other leaders were congregated on a phone call in which the riot act essentially had to be read to someone who had created a very serious problem, but it was even worse than that.  This person had introduced a bad connection who had supplied bad drugs to the gang, and there were to be serious consequences.  It was put in no uncertain terms:  Repay

this money, or you will be green-lit, meaning harmed or,
really, killed.  And this is a very troubling act and I think
should factor very seriously into the Court's consideration of
the appropriate sentence, and it is really indicative of, I
think, the -- I don't know if this is quite the right word, but
the "privilege" of leadership that Mr. Santana had.  He had
achieved a certain status where he didn't have to be the one on
the street committing acts of violence.  It was sufficient and
effective for him to be on the phone with other members,
high-ranking members, to handle this problem.

          And so, your Honor, those are the three crimes sort of
wrapped into this and made all the worse by Mr. Santana's
membership in the gang.

          Now, there's one point that Mr. Haber brings up that
I'd like to address, which is Mr. Santana's criminal history.

          Now, it is certainly true that, I believe, this is his
first felony conviction.  I don't think that the Court should
be overly comforted by the fact that his other convictions were
misdemeanors.  Some of them are in themselves still pretty
troubling.  For example, there's one, which I pointed out in my
submission, in which he threatened to cut up his girlfriend
into pieces and kill her, and in connection with that, when
police stopped his car, they found a machete in his trunk.  I
don't think that that is a crime that is made somehow less
troubling because it involved someone close to Mr. Santana

1    rather than a stranger or a fellow gang member.

2          The other, I think, suggestion from Mr. Haber's

3    submission is, you know, Well, if Mr. Santana was this big bad

4    gang member, wouldn't he have had more of a criminal record to

5    reflect that?  And that sort of goes back to a point I made

6    earlier.

7          One of the privileges of leadership is you do not need

8    to necessarily always be the one to get your hands dirty.  And

9    in fact, it's not surprising that the people who rise to the

10   highest levels of the gang have been those who are successful

11   in avoiding lengthy prison terms or other, deportation, that

12   take them sort of off the field, so to speak.  And so I don't

13   think that the Court should walk away from reading

14   Mr. Santana's criminal history as to suggest that that doesn't

15   really reflect or is inconsistent with his history and

16   leadership position in the gang.

17         So your Honor, for all of these reasons, the

18   government submits that an appropriate sentence in this case

19   would be one within the stipulated guidelines range in the

20   parties' plea agreement.

21         THE COURT:  OK.  I do have some questions.  Let me

22   ask, in terms of Mr. Santana's leadership position, I recognize

23   stemming from the wiretap are the various calls and the like.

24   Is there anything else in the record that you would point to?

25   And again, that speaks to Mr. Santana's leadership in the gang?

1    And I should say in the program.

2              MR. RODRIGUEZ:  The program, yes.

3              THE COURT:  OK.  All right.

4              MR. RODRIGUEZ:  I think your Honor has touched on all

5    of the important facts.

6              I would add I think there is an admission from

7    Mr. Santana, as reflected in the PSR, that yes, he also did

8    recruit people into the gang.  But in terms of his leadership

9    position in the program, I think your Honor has picked up on

10   it.  Right?  That translated into being someone who the

11   high-ranking person in California can count on in Tennessee and

12   who could speak to other high-ranking people in New York, in

13   Virginia.  So that is really No. 1.  Right?

14             That leadership position is reflected in his ability

15   to participate meaningfully and importantly in this

16   transcontinental enterprise, not just someone who is focused on

17   local activities with what's going on in Tennessee and that's

18   it.  That's not what he did.  He's speaking with people, as I

19   said, in California, New York, Virginia.  That's No. 1.

20             And then the second -- I think I've already touched on

21   it and your Honor appreciates it -- is sort of the

22   problem-solving aspect.  Right?  That's not something when

23   something goes wrong you call a member of the rank and file.

24   The top people get on that phone call that sort of forms the

25   basis of the extortion.  Mr. Romero, Mr. Santana, other

1    high-ranking members of the conspiracy get on the phone, not

2    just local to where the problem is, to sort of show how serious

3    it is and how dire the consequences are.  So those are the

4    elements that I would point the Court to when considering his

5    leadership position.

6              THE COURT:  Let me ask, you did mention that had there

7    been a trial, there would have been cooperators.  The

8    conspiracy that's charged and the RICO is from January 2019 to

9    October of 2019.  And to the extent you can tell me, why is it

10   limited to that time period?  I understand that that certain

11   event is because of the wiretap, but is there a reason that you

12   can tell me, or not?

13             MR. RODRIGUEZ:  So, your Honor, certainly at the time

14   of charging, we wanted to take a more conservative approach,

15   because that time period is tied to not only the wiretaps but

16   the interceptions of narcotics in -- that happened here,

17   intercepted packages through the mail.  So just as, I guess, a

18   matter of prudence or, as I said, being conservative, we wanted

19   to anchor the beginning of the conspiracy and the end of the

20   conspiracy to something concrete.  So I believe January 2019

21   was around the time where we could say OK, here's either when

22   the first package was intercepted or we had some sort of

23   tangible proof for of preparations for that happening at this

24   time.

25             THE COURT:  OK.

1          Am I correct, and you mentioned, obviously, the

2     history of MS-13 and the fact that, like a lot of gangs, there

3     are acts of violence that do occur as part of the gang

4     activity.  Mr. Santana, though, certainly none of the -- well,

5     the extortion charge, which I'll put to the side for the

6     moment, certainly is a threat of violence.  But is there

7     anything in the record that you can point to, even if it's

8     something that isn't directly in front of me, that would

9     demonstrate that Mr. Santana, other than the extortion, was

10    involved in any acts of violence?

11          MR. RODRIGUEZ:  No, your Honor.  I would say the

12    Court's right.  Other than the extortion, obviously he's

13    involved in firearms trafficking, which is tools of violence,

14    but the government -- I can't proffer that we had proof of

15    Mr. Santana's involvement in other acts of violence beyond what

16    the Court has just mentioned and what I just mentioned.

17          THE COURT:  The connect was, in fact, a personal

18    connection or several of the issues, and I think that

19    conversation occurred in September of 2019.  Did Massacre turn

20    over the connect?

21          MR. RODRIGUEZ:  So, your Honor, I'm not aware of any,

22    the way I would put it, actual violence being done onto this

23    person.  I don't know if it was resolved because the debt was

24    repaid or because this person disappeared and sort of took

25    himself off the field of play, for example.  And so for these

1    purposes, I certainly don't want to leave the Court with the

2    impression violence actually occurred to this person.  Rather,

3    it was the threat, as communicated during this call.

4           THE COURT:  So it can't be, because there are times

5    when there may be a wiretap, the law enforcement authorities

6    get an idea that there may be an act of violence and then

7    because of that, the case is either -- they intervene in some

8    ways.  Sometimes it's taking a case down.  Other times it's

9    pulling a car over that you know may contain the folks.  Is

10   there anything like that that occurred here?

11          MR. RODRIGUEZ:  So, certainly at the time, your Honor,

12   there were investigative steps taken in response to this, but

13   there's nothing concrete of the type that the Court is talking

14   about, which is to say I can't say that law enforcement took an

15   action that disrupted what would have, you know, imminently

16   been harm to this person.

17          THE COURT:  OK.  And I had mentioned earlier that

18   there's a difference between the criminal history calculation

19   in the plea agreement and the criminal history calculation by

20   the probation department.

21          Now, I've seen this before and it often is, I think,

22   in part, attributable to, as I understand it, the rap sheets

23   that are available to the United States Attorney's Office and

24   then turned over to defense counsel and what they contain and

25   what access probation has to more extensive records.  But this

is the largest discrepancy I've seen, and I guess I would ask,

in part -- yes, it relates to this case, but it relates to it

more generally, the concern being, and obviously the government

standing by the guidelines that are contained in the plea

agreement as per the agreement, but I'm wondering, do you know

if there's a specific reason that it happened in this case?

Was it because they were misdemeanors and local to

Tennessee, some of them, or South Dakota?  Do you have an

understanding of why this happened?

MR. RODRIGUEZ:  I have two responses to that, your

Honor.

One is, yes, I do think part of the problem is the

jurisdictions involved here.  We are sort of at our most

comfortable and safest and I think we get it right most often

when we're talking about New York convictions.

Here, many of these convictions are from Tennessee and

South Dakota.  I will say that the criminal history records

that the government obtained included some, but not all, of

these Tennessee cases.  What was not clear from those records

always was how they were disposed of, which is to say, did they

result in a conviction; did they result in a dismissal or

something in between?  And so that was part of the problem, No.

1.

No. 2, my memory is -- Mr. Haber can correct me if I'm

wrong, is that none of the South Dakota convictions, for

1   whatever reason, appeared on any of our criminal history

2   records that we pulled and turned over in discovery.  So I

3   don't know if there is something particular about South Dakota

4   criminal convictions and their ability to be reflected on our

5   criminal history records, but those are really the two things.

6          THE COURT:  I think there may be an issue with South

7   Dakota.

8          MR. HABER:  Your Honor, I'm sorry to interrupt, but my

9   client has informed me that he's never even been to South

10  Carolina or South Dakota, so I don't even get it, where it's

11  coming from.  Maybe that's why it's showing up with nothing in

12  terms of dispositions on there.

13         THE COURT:  Yes.  That I don't know.

14         Let me just take a quick look, because I actually was

15  going to have some questions about it.  It's Sioux Falls Sioux

16  Falls on January 23 of 2005 and October 3 of 2008, September 14

17  of 2008.  I don't know, Mr. Haber, how the probation

18  department -- well, let me just confirm one thing.  I don't

19  believe, first of all, that any of the -- it doesn't appear

20  that any of the South Dakota convictions resulted in any

21  criminal history points.

22         MR. RODRIGUEZ:  Your Honor, I think on paragraphs 116,

23  117 appears to result in three.

24         THE COURT:  Three points, yes.

25         Well, let me ask, Mr. Haber, if you want, I'll give

1    you time to look into that.  Obviously that would change the

2    guideline calculation if there's some mistake that's been made.

3    I, again, don't know how they were matched up by the probation

4    department.  It's something I was curious about, the South

5    Dakota things, because everything else was in Tennessee.  Do

6    you want some time?

7        MR. HABER:  Let me have a moment to speak to my

8    client.

9        THE COURT:  Yes, absolutely.

10        MR. RODRIGUEZ:  Your Honor, if it's helpful for

11   Mr. Haber to consider, the government would have no objection,

12   if this is something that the Court was inclined to do, for the

13   Court to recalculate the guidelines disregarding the South

14   Dakota criminal history points.

15        THE COURT:  I can do that.

16        Why don't you go ahead, Mr. Haber, and speak to your

17   client and then we can discuss how to proceed.

18        MR. RODRIGUEZ:  Your Honor, I believe the parties have

19   a proposal for the Court's consideration, which is if the Court

20   were to disregard the three criminal history points reflected

21   in paragraphs 116 and 117 of the PSR, I believe that would

22   result in Mr. Santana having seven criminal history points

23   rather than ten, which would put him in category IV rather than

24   category V and result in a guidelines range of 188 to 235

25   months.

1          THE COURT:  Yes, I think that's right.  That's what I
2     saw.
3          A couple of things.  No. 1, I'd like to confirm that
4     Mr. Santana wants to go forward.
5          No. 2, I think the problem needs to be resolved in
6     some way.  The presentence report is going to follow
7     Mr. Santana when he goes to prison, and I don't know if it
8     impacts his designation.  There are certain things that I would
9     want to know, because I would literally strike those
10    paragraphs; as things stand right now, I would.  I don't have a
11    problem not considering those in light of the fact that it's
12    disputed, and I have no basis -- again, because I have not
13    spoken to the probation officer, I have no basis to make a
14    ruling three points should be counted in light of the dispute.
15         Having said that, there still are these other issues
16    that would need to be addressed.
17         Mr. Haber, do you want a moment to speak to
18    Mr. Santana?
19         MR. HABER:  Yes, your Honor.  Why don't we do that.
20    Yes.
21         THE COURT:  And then we can proceed.
22         MR. HABER:  Your Honor, I've spoken to my client, and
23    I think he wants to proceed and go forward.  Ultimately, it may
24    change the guideline, but it doesn't change the recommendation,
25    which is lower.  He just said that he's never been there, in

South Dakota.  I don't know if it's a mistake on the record, or what.  But in any event, it doesn't change, I think, the ultimate sentence that he would get if it's not counted.  It shouldn't be counted, and the government is willing not to count it.

THE COURT:  Sure.  Let me just ask, though.

Mr. Santana, I'm prepared to allow some time to get to the bottom of the three criminal history points, the South Dakota issue, for lack of a better term; you understand that I'm willing to do that?

THE DEFENDANT:  Yes, sir.

THE COURT:  Understanding that, though, do you wish to go forward today if I basically, in essence, recalculate the guidelines, take away those criminal history points -- and there are three of them.  When you take away those criminal history points, when you look at the guideline book, in the back, there's a chart, and that chart indicates that the guideline that would be applicable here would be 188 to 235 months.

Now, as I mentioned, the guidelines, although I need to consider them as a factor, one factor, in what an appropriate sentence is for you, they're no longer binding, but I still have to consider them.  In light of that, what would you like to do?  Would you like to proceed today?

THE DEFENDANT:  Yes, sir.  I would leave it up to God.

1          THE COURT:  Well, I understand that.  I understand

2     that, but it's ultimately your decision.

3          THE DEFENDANT:  Yes, sir.

4          THE COURT:  So you'd like to proceed.

5          THE DEFENDANT:  Yes, I'm ready to proceed --

6          THE COURT:  OK.

7          THE DEFENDANT:  -- and get this over with.

8          THE COURT:  OK.

9          THE DEFENDANT:  Thank you, your Honor.

10          THE COURT:  All right.

11          The only thing I would ask is that in the interim,

12     once sentencing is completed, I would ask that the parties

13     inquire of the probation department and figure out, not for the

14     purpose of propounding another sentencing, but for the purposes

15     of making sure that the presentence report is accurate.  If it

16     turns out that there's a mistake and those issues should come

17     out, I can, on the judgment, indicate that those items should

18     be stricken or request the probation department actually amend

19     the report to take them out.  And in that way, I think it would

20     cover any issues, because the presentence report will be used

21     for purposes, I think, of designation and also is something

22     that -- well, I actually don't know whether it goes to the

23     facility.  It may go to the facility but only -- in other

24     words, I don't even think Mr. Santana would have access to it.

25     That may be a recent Bureau of Prisons issue, but I'd like to

1    make sure that it's accurate.  So I would just ask the parties

2    to endeavor to do that once we complete the sentencing.

3            THE DEFENDANT:  Thank you.

4            MR. RODRIGUEZ:  Yes, your Honor.

5            THE COURT:  All right.  Thank you.

6            In the presentence report, Mr. Rodriguez, it also

7    indicates -- and I apologize; I think it's paragraph 12 -- that

8    Mr. Santana had had some disciplinary infractions while he was

9    in prison.  But the presentence report obviously is somewhat

10   dated.

11           Do you know if there were any other infractions after

12   November of 2020.

13           MR. RODRIGUEZ:  Unfortunately I do not, your Honor.

14           THE COURT:  OK.  All right.  Thank you.

15           Mr. Haber, do you wish to be heard?

16           MR. HABER:  I do, your Honor, briefly.

17           THE COURT:  Yes.

18           MR. HABER:  There are a couple of issues.  The one

19   issue that's been the most troubling to me, and I certainly

20   made that known, I think, in my letter and in my conversations

21   with the government, is that a man doesn't reach 40 years of

22   age and become a major player in a gang and not have a criminal

23   record for gang activity.  He has a criminal record, but none

24   of it is related to MS-13.  Not a single arrest or conviction

25   of his misdemeanors is related to MS-13 activity.

1           Now, I believe that the government believes that he's

2    some kind of mover and shaker, but reality doesn't support

3    that.  It doesn't.  The phone calls, which I've listened to,

4    and I've also discussed that with the government, all of the

5    orders are being given by somebody else.  He's trying to carry

6    them out.  Is he an organizer as a consequence of that?

7    Absolutely.

8           There's no evidence that he threatened anyone even

9    though I realize that there was coercion, and I understand, I

10   heard the statement by the lead defendant, you know, Catch the

11   guy; he's got to pay back the money or we're going to put a hit

12   out on him, or some comparable thing.  His response was he just

13   went along with what everybody else went along with.  I just

14   don't think he's this big bad guy.  He doesn't have the

15   intellect to do it.  He doesn't read or write Spanish fluently

16   or English.  He's just not that guy.

17          The fact is that he's been a member of MS-13 since

18   he's 13 years old and he has done some recruiting.  There's no

19   doubt about that.  But I believe this is the first time in his

20   activity with MS-13 that he got involved with this rather

21   larger conspiracy.  But none of this was in his mind.  He

22   didn't hatch this conspiracy.  He went along with the program

23   as a gang member, and he made a big mistake.

24          My problem with all of this is to look at a 168-month

25   recommendation for someone with a mental health history

comparable to what Mr. Santana has, he's like an adolescent,

He's been hospitalized for paranoid schizophrenia.  He's

bipolar.  He's been in and out of hospitals his whole life.

His problem is not taking his medication.  When he takes his

medication, he's very functional, and you can see by the

letters of his family he's very loving and he's always there

when he takes his medication.  His problem is not taking his

medication and he goes back out there and he does stupid

things.

         Violence only on his family, unfortunately, because

most of these charges are domestic violence.  Most of these

charges, not all of them.  There's a driving while intoxicated

and reckless driving or driving without a license or driving

with a suspended license and a couple of petty thefts.  For a

big guy of MS-13, it's incomprehensible that he could be that

big.

         THE COURT:  I think there is one, I think, still

related family member, which is the open matter which appears

to be open, which is down in Tennessee, but there was also, I

think, an incident involving, there was a dispute related to

money, and Mr. Santana -- and an individual was yelling at or

cursing at his aunt or something like that.

         MR. HABER:  You're talking about the open case that he

has currently?

         THE COURT:  No.  I think the open case may be slightly

1    different.  I think the open case is the father of --

2              MR. HABER:  It's a relative.  It's family.

3              THE COURT:  Correct.  It involves an aunt.  I don't

4    know the individual -- they get into a fight basically, and I

5    don't know -- I mean it's possible that that individual was a

6    family member, but I don't think, it didn't indicate that.

7              MR. HABER:  I think it was the boyfriend of one of

8    the --

9              THE DEFENDANT:  My aunt.

10             THE COURT:  And so they got into a fight.  I don't

11   know if it resulted in any criminal history, but there was at

12   least that one, I guess you could say related in a sense that

13   he was, as your client indicated, the boyfriend of his aunt.

14   I'm sorry.  I interrupted, but if you could, as you're speaking

15   about the criminal history, I was going to ask about the open

16   case.  There was a court appearance that was supposed to happen

17   in January 2021.

18             MR. HABER:  I spoke to his sister Flora, who lives in

19   Tennessee and unfortunately couldn't get up here, but she told

20   me that whoever -- it was family-related stuff in that the

21   guy's not showing up for court.  The case is probably more

22   likely than not going to be thrown out over time especially

23   depending on the amount of time he gets.  But he's not

24   cooperating, he's not looking to prosecute.  That's my

25   understanding.

1          THE COURT:  OK.

2          MR. HABER:  Obviously I haven't spoken to him.  He's

3    in Tennessee.

4          THE COURT:  Yes.

5          MR. HABER:  But all of these assaults, there were ten

6    of them, they were all family members.

7          THE COURT:  I get it.  It means that he's not

8    necessarily --

9          MR. HABER:  He's bad.  What he did is not good.  I'm

10   just saying a lot of it was out of his control because he

11   wasn't taking his medication, for a number of reasons.  One is

12   he couldn't afford the shot.  They can give you a shot now that

13   lasts for a substantial amount of time.  And he had to take his

14   meds so he had to take his meds every day.  I don't know what

15   happened.

16         Look, I know people that are bipolar and they have

17   issues sometimes.  Sometimes you've got to deal with it.

18   Sometimes they're rational if you talk to them and they go

19   along with the problems, sometimes not.  He definitely has

20   mental health illness, and he needs help.  There's no doubt

21   about that.  The real question is can the Bureau of Prisons

22   provide that help?  Giving him that amount of time, he's not

23   going to get that help by the Bureau of Prisons.  It's laid

24   out, I think, well by Kathy O'Boyle in the mitigation letter

25   that they just don't have the ability to care for these people.

1          So we're talking about, maybe, teaching people a

2    lesson that you shouldn't do this by giving him that kind of

3    time?  It just doesn't make sense for someone that doesn't have

4    a felony.  There's all this talk about the LA table.  I don't

5    even know what it means, your Honor.  I've represented gangs in

6    this courthouse for 35 years or longer.  Gangs usually have a

7    hierarchy that can tell you who they are.  You're a king or

8    you're a warlord, or something.  You're a 30 charge.

9          We don't have that here.  We have a lot of conclusions

10   that are being reached without any explanation as to how that's

11   true and what he did to further that -- from a violence

12   perspective, from any perspective.  You know, they're painting

13   him like he's a violent guy.  He's not a violent guy.

14          THE COURT:  No, no.

15          MR. HABER:  He's a sick guy.

16          THE COURT:  Just to be clear, there's no violence.

17   Right?

18          MR. HABER:  No.  I think the government made that

19   clear when you questioned them.  I'm not suggesting not.  But

20   the suggestion in saying that he's a part of the hierarchy, you

21   get the smell of MS-13 all over you.  We know that that's a

22   despicable gang, that they've done some horrible things and

23   that they kill people, but that's not a reason to give him 14

24   years in jail.  That's a ton of time that they're asking for,

25   and it just doesn't make sense and it doesn't seem fair.

1          Now, I've been doing this a long time and I know when

2    I've got bad guys and I've got bad guys.  He may be a bad guy,

3    but he's not anywhere near leadership, where he makes decisions

4    and orders people shot or killed or hurt.  We never heard

5    anything like that on these tapes.  I'm just suggesting, look,

6    it's a conspiracy, I look at it as a gang conspiracy.  He

7    should certainly do time.  He needs to learn a lesson from

8    this, and I think he will.

9          If it's any consolation to you, his mother told me

10   she's moving to Tennessee when he gets out and she will keep an

11   eye on him and make sure he takes his medication, which has

12   always been an issue in his life.  I think there should be some

13   equity in this, some fairness in this in terms of looking at

14   the whole picture without drawing conclusions, because we talk

15   about gangs in a way where we always draw conclusions.  We

16   always assume.  But his history doesn't show that.  The man's

17   40 years old.  The history doesn't show him to be dangerous

18   like that.  Selling guns in Tennessee isn't like selling guns

19   in New York.  It's a lot different, as the Court, I'm sure, is

20   aware.  It's easier to get them and it's easier to move them.

21          THE COURT:  Yes.

22          MR. HABER:  I'm not suggesting that anything he did

23   was right, and he certainly needs to pay for it, but let's come

24   up with a fair number, a number that's reasonable, a number

25   that doesn't take away years of his life without treatment.

1    That's all we're asking for.

2              THE COURT:  OK.

3              MR. HABER:  That's all, your Honor.

4              THE COURT:  All right.

5              Mr. Santana, would you like to say anything on your

6    own behalf?

7              You can remain seated.  I just ask that you speak into

8    the microphone.

9              THE DEFENDANT:  Yes, sir.  I'm just being pointed as a

10   leader, which, you know, I was, you know.  I'm not going to

11   come into court and lie to you, but part of these arguments, I

12   didn't even know about it.  Like the drugs that were coming,

13   the package that they say that they seized over here in New

14   York, it wasn't part of me.

15             And then the other, with the bad connection and

16   everything, it wasn't part of me either.  It was not in my

17   hands.  Like he said, it was not in my hands.  So, is -- OK, I

18   am MS-13.  I recognize that and I've been in it since I was 13

19   years old.  I'm not going to lie to you.  I am, but I'm not --

20   I'm being charged with cases that's not even in my hands, not

21   even involved my decisions that I complete the, the, the

22   crimes, you know.  Like, they were masterminds, that it was my

23   part, that I was receiving money.

24             No, it was not a part of me, and that's, that's -- the

25   whole time that they point to me is like, I'm, like, all right,

1    I'm willing to take this time, but what about my treatment?

2    You know, I have mental illness.  All right.  If you send me to

3    a federal medical center, I could get help, that's fine with

4    me.  You know what I'm saying?  I'm not asking -- you know, I

5    don't want a lot of time, but just, you know, just, you know,

6    do the reviews of my, my history, crime history, where there's

7    been mental illness problems that when I don't take my medicine

8    I get agitated, I don't sleep for two weeks.  If I don't get

9    the Abilify shot, I can't function like I should.

10           Right now I'm functioning good because I get my

11   medicine over there in MDC.  Every night I take it, I sleep

12   well.  You know, I'm not aggressive, so, you know, and it's

13   healthy, you know.  And I learned my lesson.  It's almost two

14   years that I've been incarcerated and I learned my lesson, you

15   know.  And I'm just -- you know, asking you to, you know, see

16   all that.  And when I get out, my mom is going to go take care

17   of me and I just want to spend time with my grandsons and my

18   family.

19           THE COURT:  OK.

20           THE DEFENDANT:  That's it.

21           THE COURT:  Thank you, Mr. Santana.

22           Mr. Rodriguez, I forgot to ask a question related to

23   the relative culpability of the defendants that are contained

24   on the chart on page 4 of the sentencing submission of the

25   government.  You indicated that it goes from most culpable to

1   least culpable, from the government's perspective, but why is

2   Mr. Santana considered more culpable than José Garcia or

3   Christian Guerrero-Melgares.

4             MR. RODRIGUEZ:  So --

5             THE COURT:  And I guess the question has a sort of

6   finer point on it.  Is it just because of where the government

7   had placed each of them within the program?

8             MR. RODRIGUEZ:  There's two components to this.

9             THE COURT:  Yes.

10            MR. RODRIGUEZ:  But I think once you get to

11  Mr. Santana, Mr. Garcia and Mr. Guerrero-Melgares, I would

12  point to two things that distinguish those three people.

13            One is the extent of their involvement in facilitating

14  the nationwide methamphetamine trafficking, No. 1 -- maybe

15  three things.

16            No. 2 is Mr. Santana's involvement in being a higher

17  ranking member of the table than Mr. Garcia and

18  Mr. Guerrero-Melgares, and I think that's reflected, for

19  example, in the extortion phone call.  This is the government's

20  view of their relative culpability, but perhaps there's not as

21  massive of a leap between the three as there would be, for

22  example, closer to the bottom of that chart.

23            THE COURT:  OK.  All right.  I think I understand.

24  All right.  Thank you.

25            Let me ask, is there any reason why sentence should

1    not be imposed at this time?

2             MR. RODRIGUEZ:  No, your Honor.

3             MR. HABER:  No, your Honor.

4             THE COURT:  As I stated and the parties agreed,

5    Mr. Santana's guideline range is 188 to 235 months.  As I

6    mentioned, that reduces the guideline calculation in the

7    presentence report by taking out those three criminal history

8    points.

9             Do the parties agree that once those are taken out the

10   guidelines range is 188 to 235?

11            MR. RODRIGUEZ:  Yes, your Honor.

12            MR. HABER:  Yes, your Honor.

13            THE COURT:  Under the Supreme Court's decision under

14   *Booker* and its progeny, the guideline range, as I mentioned, is

15   one factor that I must consider in deciding an appropriate

16   sentence.  I'm also required to consider the other factors set

17   forth in 18 U.S.C. Section 3553(a), and I have done so.

18            Now, those factors include, but are not limited to,

19   the nature and circumstances of the offense and the personal

20   history and characteristics of a defendant, since each

21   defendant must be considered as an individual.

22            Now, I'm also required to consider the need for the

23   sentence imposed to reflect the seriousness of the offense,

24   promote respect for the law, provide just punishment for the

25   offense, afford adequate deterrence to criminal conduct and to

1   avoid unwarranted sentencing disparities, among other things.

2           First, I'm going to address the circumstances of the

3   offense.  There's no question, Mr. Santana, that you've been

4   convicted of a serious offense.  First, being a member and a

5   leader, as you mentioned, of MS-13 is itself a serious offense

6   because it's a criminal organization whose purpose is to commit

7   crimes so that it can benefit its members.

8           Now, here, as a general matter, the group has been

9   involved -- leaders and members and associates -- in committing

10  acts of murder, extortion, firearms trafficking and

11  distribution of narcotics.  You're not charged with and there's

12  no evidence here -- again, putting aside the extortion that we

13  mentioned -- that you were involved in any violence.  But

14  there's no question that MS-13 is.  Having said that, that's

15  not what you're charged with here.

16          However, you did admit, as part of the plea agreement,

17  that you participated in the enterprise, MS-13, with the

18  knowledge that members of that organization conspired and

19  committed and attempted to commit acts of violence against

20  rival members and others in furtherance of the enterprise.

21  Again, none of that's charged.  You're not charged with that.

22          Second, as you've conceded, you are a leader.  What

23  I'll say is a leader for purposes of the guidelines.  In terms

24  of where you fell in the hierarchy of MS-13, for my purposes,

25  I'm treating you as a leader as it stands for purposes of the

guidelines, as I mentioned, and there were four points that were added to your guidelines calculation.  But again, there's no question that you were a member of this criminal enterprise.

Now, third, you participated within that enterprise in a conspiracy to distribute methamphetamine and cocaine.  I recognize methamphetamine and making it a distribution network from Mexico into the United States, to Tennessee, New York, California, may not have been your brainchild; in other words, it wasn't something that you came up with.  Maybe Mr. Romero may have decided that that was the way that the organization should go.  But it is clear that you were going of part of that in assisting to accomplish that, and that as part of that you agreed with these other folks, including your codefendants, to try and make that happen, and as part of that there were certain seizures that were made.  You made a sale of cocaine, there were three firearms which you sold, so there's no question that you were involved, and those are all serious offenses.

Now, to Mr. Haber's point about gun trafficking in Tennessee, yeah, it might be easier because the gun laws are what they are in Tennessee, but that doesn't make it -- that still makes it a crime, and the simple fact is the CI/UC who purchased the guns went down to Tennessee.  In part, that was probably -- well, in part because for you guys to travel up here, you would have been as you traveled with the guns

1    committing crimes in each state as you would come up.  So there

2    may have been a reason why they decided to do that.

3           But putting that aside, you're putting guns out there

4    and on the street in the hands of people who you don't know one

5    way or the other what they're going to do with it.  But in all

6    likelihood, it's going to be criminal activity; otherwise, they

7    would go buy the guns themselves.

8           Fourth, and again, I recognize that you may not have

9    been the one who said that the member of the organization was

10   going to be green lit if you didn't get the money back.  But as

11   you said, you were part of it and you went along with that.

12   And that's part of being part of a conspiracy and part of a

13   group, and here, the gang is MS-13.  So you may not have been

14   the person who was going to, when it ultimately came to it,

15   beat up the MS-13 member or kill the person, but you would be

16   part of it.

17          And so although I recognize that there are others that

18   are certainly more culpable than you are, some who are charged

19   here and others who have yet to be charged, and I recognize

20   that.  So that's Mr. Haber's point, that, look, you're not --

21   there are others that are certainly more culpable and the

22   criminal activity that you're charged with is in a very, in a

23   short period of time.

24          But now I'll address your history and characteristics.

25          It's clear from the presentence report and the

```
1     submission that I got from Mr. Haber that your childhood was
2     somewhat turbulent due to your father's temper and the abuse he
3     inflicted was verbal and emotional on you and your siblings;
4     physical, according to the PSR and the submissions, against
5     your mom when he was drunk because, as mentioned, he was an
6     alcoholic.  I mean it was so severe that you committed to
7     yourself that, when you got older that you would try and
8     intervene.  In fact, when you were 16 or so, you did intervene
9     to prevent, you know, when your father was abusing your mother,
10    you intervened in such a way that he stopped --
11              THE DEFENDANT:  Yes, sir.
12              THE COURT:  -- at least that particular time.
13              THE DEFENDANT:  Yes.
14              THE COURT:  So I recognize that.  I also recognize
15    that your family did struggle financially when you were growing
16    up.  Your dad initially worked in a clothing factory and your
17    mom cleaned houses and residential properties, and that your
18    dad had to stop working because of a back injury but then began
19    selling pickup trucks in El Salvador, and things improved but
20    your family continued to struggle financially.
21              THE DEFENDANT:  Yeah.
22              THE COURT:  But you said your parents did their best
23    to provide for you, and your mom is here in court.  And I've
24    read all the letters submitted by your siblings and your
25    ex-wife, and it's clear to me that those folks support you.
```

They're going to support you once you're out of prison, and I
take it that, from what Mr. Haber said here today but also in
the submissions, that your mom intends to move back to
Tennessee when you're released to the home that she owns there,
which I believe is currently being rented.

So I will take their view of your character into
consideration in determining what an appropriate sentence is
for you.  But I will say that their love, their support, you've
had that your entire life.  But for whatever reason, that
didn't dissuade you from being in the life and certainly didn't
dissuade you from the specific crimes that are charged here.
And I would add to that, even the birth of your grandson didn't
dissuade you.  In other words, as you understand, that this
could lead to where you are right now.

THE DEFENDANT:  Yes, sir.

THE COURT:  So I have to balance those things out, and
I recognize that your family has indicated that they consider
you a loving father and son, grandfather and otherwise.  I
recognize that.

Now, I also recognize that you have a history of
mental health issues; that over the years you have at times
taken medication and sometimes you haven't.  Even when you were
16 or 17, you were diagnosed as being paranoid, having paranoid
schizophrenia, and you spent approximately a year in a hospital
facility.  And unfortunately, while you were there, your dad

1    passed away during that time.

2          So, look, I will consider the circumstances of your

3    childhood, your mental illness as part of determining what an

4    appropriate sentence is for you.

5          THE DEFENDANT:  Thank you.

6          THE COURT:  Now, I can't gauge when you were on or

7    when you were off medications.  I take it that sometimes you

8    were off your medication when you committed certain of the

9    crimes that are part of your criminal history.

10          Now, putting aside the South Dakota things, there's no

11    question that at times, and whether you were on your medication

12    or not, there were times that you were agitated and even

13    violent.

14          A couple of things.

15          The fact that, perhaps, domestic violence isn't

16    treated as a serious enough crime in society or in Tennessee,

17    where at least some of the incidents you put your hands on

18    folks and the fact that they were misdemeanors, they're

19    misdemeanors, but I think the severity of them, especially when

20    you're actually assaulting somebody, can't be understated.  And

21    I also understand that the reality of the situation is your

22    family loves you, and I think in the end, they didn't want you

23    to get in trouble.  You probably didn't want to put them

24    through it and it resulted in those pleas, but there is no

25    question that there had been a lot, 16 or 17, taking away the

1     South Dakota convictions for misdemeanors.

2           Having said that, you have no felony convictions, so I

3     recognize that.  And the open case, it remains to be seen

4     what's going to happen with that, but here again, not unlike

5     this crime, you weren't dissuaded from committing those crimes

6     by any of the, even though short, periods of incarceration that

7     you spent.

8           Now, I'm also going to consider the fact that certain

9     portions of the time you spent in prison was during the

10    pandemic.

11          THE DEFENDANT:  Yes, sir.

12          THE COURT:  I recognize that the conditions in the

13    prison, not only in the Southern District, not only in MCC and

14    MDC, but throughout the country, were more harsh.

15          THE DEFENDANT:  Yes.

16          THE COURT:  And not unlike the whole society was put

17    through a horrible time, I wreck nice and I'll consider the

18    fact that it was certainly more harsh.  There were no programs

19    and you were locked down most of the time.

20          THE DEFENDANT:  Yeah.

21          THE COURT:  Hot meals were few and far between.

22    Having said that, the facility was trying to do what it could

23    to prevent the spread of the virus in a congregate situation,

24    and that's not an easy thing to accomplish.  And I also

25    recognize that during that time in prison you did contract

1    COVID-19.

2         THE DEFENDANT:  Yes, sir.

3         THE COURT:  Fortunately, you've recovered, but that

4    didn't mean that while you were sick you weren't concerned, and

5    my understanding is you reported to your mom that at some point

6    you thought that you might pass from the virus.  So I'll

7    recognize that and I will consider it in determining what an

8    appropriate sentence is for you.

9         THE DEFENDANT:  Thank you.

10         All right.  Mr. Santana, if I could please ask you to

11    rise for the imposition of sentence.

12         It is the judgment of the Court that you be committed

13    to the custody of the Bureau of Prisons for a period of 110

14    months on each count to run concurrently.

15         You can be seated.

16         That period of incarceration will be followed by three

17    years of supervised release on Count One and five years'

18    supervised release on Count Two to run concurrently.

19         There will be no fine as the probation department has

20    determined that you don't have the wherewithal to pay a fine.

21         You must pay a $100 special assessment, which is due

22    immediately.

23         Was there a forfeiture allegation?  Is the government

24    seeking forfeiture?

25         MR. RODRIGUEZ:  The government's not seeking

forfeiture, your Honor.

          THE COURT:  OK.  So there won't be any forfeiture
here, and no victims have been specifically identified so
there's no restitution that I'm going to order.

          You must pay a $200 special assessment, which is due
immediately.

          Now, I believe that this sentence is sufficient but
not greater than necessary to comply with the purposes of
sentencing set forth in Title 18, United States Code, Section
3553(a).

          With regard to supervised release, you'll be subject
to the mandatory conditions on pages 47 and 48 of your
presentence report as well as the standard conditions and
special conditions on pages 48 to 50.

          Have you read those conditions of your supervised
release?

          THE DEFENDANT:  Yes, sir.

          THE COURT:  OK.  All right.  So part of that will
include, one of the things -- and I'm not mentioning all of
them.  One of the things will include mental health treatment
when you're out.  When you're in prison, I hope -- well, when
you're in prison, you should at a minimum continue to get the
medication that you've been on, and depending upon where you
go, I would hope that there would be some mental health
treatment that you could get while you're in prison.

1            Now, let me ask, Mr. Haber, because I'm more than

2     willing to recommend a facility close to Tennessee to

3     facilitate family visits, and I'll also recommend that

4     Mr. Santana be considered for a facility that provides mental

5     health maintenance.  As between the two, do you have a sense,

6     because I can either just put it in the judgment just as that,

7     both recommendations.

8            Now, Mr. Santana, these are recommendations.  I don't

9     have the authority --

10            THE DEFENDANT:  Yes, sir.

11            THE COURT:  -- to direct the Bureau of Prisons to

12     either house you in a certain facility or to provide you with

13     certain services.  Having said that, I can and will recommend

14     both of those things.  So, Mr. Haber, do you have a sense of

15     which -- I don't know enough about the facilities in that area

16     of the country to know.

17            MR. HABER:  I think there's a facility in Lexington,

18     Kentucky, that's probably a medical facility.  So I think both

19     of those recommendations we would appreciate.

20            THE COURT:  OK.

21            MR. HABER:  And hopefully they'll get him into an

22     institution where he'll get some help.

23            THE COURT:  All right.  I'll make those

24     recommendations.  I'll just put it in there --

25            MR. HABER:  Thank you.

1          THE COURT:  -- and leave it to the Bureau of Prisons

2     to figure out what the best situation will be.

3          MR. HABER:  Thank you.

4          THE COURT:  Let me ask, does either counsel know of

5     any legal reason why the sentence should not be imposed as

6     stated?

7          MR. RODRIGUEZ:  No, your Honor.

8          THE COURT:  Mr. Haber.

9          MR. HABER:  No, your Honor.

10          THE COURT:  That's the sentence that I'm imposing.

11          Now, you have the right to appeal your conviction and

12     sentence now to the extent it's inconsistent with your plea

13     agreement.  The notice of appeal would have to be filed within

14     14 days of the judgment of conviction.  If you're not able to

15     pay the cost of an appeal, you may apply for leave to file an

16     appeal *in forma pauperis*; in other words, as someone who is

17     indigent.  If you request, the clerk of the court will prepare

18     and file a notice of appeal on your behalf.

19          Now, Mr. Santana, it's not the sentence Mr. Haber

20     asked for, but we talked about the sentence recommended by

21     probation or by the government, and the only thing I can say is

22     I hope that when you do get out, you're true to your word, that

23     you honor your family and don't commit any additional crimes.

24          Look, I don't want to see you again.  And God willing

25     I'll be here when you get out.

 1          THE DEFENDANT:  Yeah.

 2          THE COURT:  And if I'm not, whoever the judge is that

 3  gets this is going to get this transcript.  So I'm just saying

 4  you've got to keep your nose clean.  The next time is going to

 5  be much worse, I'll put it that way.

 6          THE DEFENDANT:  I understand, and I learned my lesson.

 7          THE COURT:  All right.  Well, I hope so.  I hope so.

 8          THE DEFENDANT:  Thank you.

 9          THE COURT:  To the extent there are any outstanding

10  indictments or counts, they're going to be dismissed.

11          Let me ask whether there are any other applications.

12          Mr. Rodriguez.

13          MR. RODRIGUEZ:  Not from the government, your Honor.

14          THE COURT:  Mr. Haber.

15          MR. HABER:  Not from the defendant.

16          THE COURT:  OK.  Thank you, everyone.  Sorry it took

17  as long as it did.

18          Mr. Santana, as I said, good luck.

19          We'll stand adjourned.  Thank you.

20          (Adjourned)

21

22

23

24

25